IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

REGINA YOUNG                                                                                            PLAINTIFF

V.                          CASE NO.: 3:12CV00314 BD

CAROLYN W. COLVIN,[1] Commissioner,
Social Security Administration                                                                  DEFENDANT

ORDER REMANDING TO THE COMMISSIONER

Regina D. Young sought judicial review of the denial of her application for supplemental security income.[2]  In her June 23, 2008 application, Ms. Young alleged that she became disabled on January 1, 2004, but at her hearing she amended the onset date to June 2, 2008.  (SSA record at 41-42, 192-99)  Ms. Young based her disability claim on diabetes, high blood pressure, fibromyalgia, arthritis, carpal tunnel, back problems, and residuals from an attack.  (*Id*. at 111, 229)

Ms. Young was forty-seven years old at the time of her November 29, 2011 hearing.  (*Id*. at 66)  She had passed the General Educational Development exam.  (*Id*.)

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  She is therefore substituted as the named Defendant for Michael J. Astrue, pursuant to Fed.R.Civ.P. 25(d).

[2]Ms. Young also applied for disability insurance benefits, however, her application was dismissed due to a lack of qualifying earnings and her date last insured.  (#14 at p. 2)

She did not have any past relevant work.  (*Id*. at pp. 65-66)  She lived with her son.  (*Id*. at 45, 193)

**The Commissioner's Decision**

After holding a hearing,[3] the Commissioner's Administrative Law Judge ("ALJ") denied Ms. Young's application for benefits.  (*Id*. at 10-26)  The ALJ determined that Ms. Young had severe impairments– type II diabetes mellitus, a focal full-thickness distal supraspinatus tear with a tiny amount of fluid seen in the subdeltoid bursa of her right shoulder, carpal tunnel syndrome status post release of right wrist; degenerative changes in her cervical and lumbar spine, obesity, hypertension, major depressive disorder, and bipolar II disorder.  (*Id*. at 12)  The ALJ also found, however, that Ms. Young had the residual functional capacity ("RFC") to perform light work, except that she would be limited to only occasional stooping, crouching, crawling or kneeling; would not be able to perform overhead reaching with her dominant upper extremity; would not be able to perform rapid repetitive flexion/extension of her non-dominant wrist; and would be limited to work where interpersonal contact was incidental to the work performed, complexity of tasks were learned and performed by rote, with few variables, little judgment required, and supervision was simple, direct and concrete.  (*Id*. at 14)  Because

---

[3]Ms. Young had a hearing on March 3, 2010, which resulted in a May 12, 2010 opinion denying benefits.  (SSA record at 38-61, 82-106) Ms. Young requested review by the Appeals Council, which the Council granted and then later vacated the ALJ's decision and remanded the case, resulting in Ms. Young's November, 2011, hearing.  (*Id*. at 107-110)

the vocational expert testified that there were jobs available that a person with Ms. Young's RFC could perform, the ALJ concluded that she was not disabled under the Social Security Act and denied the applications. (*Id*. at 25-26)

After the Commissioner's Appeals Council denied Ms. Young's request for review, the ALJ's decision became a final decision for judicial review. (*Id*. at 1-5) In reviewing the decision, the court must determine whether substantial evidence supported the decision and whether the ALJ made a legal error.[4]

**Step Five**

Ms. Young complains that the vocational expert's testimony was in conflict with the *Dictionary of Occupational Titles* ("DOT") and argues that the conflict was not addressed by the vocational expert. Ms. Young claims her impairments prevent her from working at the jobs identified by the vocational expert.

When a vocational expert's testimony conflicts with the DOT, the DOT controls unless the DOT classifications are not rebutted. *Jones v. Astrue*, 619 F.3d 963, 978 (8th

---

[4]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner conformed with applicable regulations); *Slusser v. Astrue*, 557 F.3d 923, 925 (8th Cir. 2009) (stating that the court's "review of the Commissioner's denial of benefits is limited to whether the decision is 'supported by substantial evidence in the record as a whole'"); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny an applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

Cir. 2010). The DOT classifications may be rebutted with vocational expert testimony demonstrating that specific jobs may be ones that a claimant can perform. *Id*.

Here, the vocational expert testified that a person with Ms. Young's limitations could perform work as a table inspector (DOT 739.687-182), which is described by the DOT as sedentary, but requires "frequent" reaching, handling, and fingering, and is unskilled with an SVP of 2." (*Id*. at 77-78) The vocational expert also testified that a person with Ms. Young's limitations could perform work as a cashier (DOT 211.462-010), which the DOT describes as light work that requires "frequent" reaching, handling, and fingering, and is unskilled with an SVP of 2 and a reasoning level of 3.

At the hearing, the ALJ never asked the vocational expert whether his testimony was consistent with the DOT. In his opinion, the ALJ found that the vocational expert's testimony was "consistent with the information contained in the *Dictionary of Occupational Titles*." (*Id*. at 26, 76-78)

The job of table inspector, as defined by the DOT, requires frequent reaching, handling, and fingering. *Dictionary of Occupational Titles* 739.687-182. In the hypothetical posed to the vocational expert, the ALJ limited the hypothetical individual to no overhead reaching with her dominant upper extremity and no rapid repetitive flexion/extension of her non-dominant wrist. The vocational expert did not explain how his testimony that a hypothetical individual, who can not reach overhead or perform

repetitive extension with her non-dominant wrist, could perform the job of table inspector which requires frequent reaching, handling, and fingering.

The ALJ also testified that the hypothetical individual could perform work as a cashier. The cashier job, as set forth in the DOT, also requires frequent reaching, handling, and fingering. *Id*. at 211.462-010. The DOT does not specify whether the job only requires reaching overhead or handling with the dominant or non-dominant hand. Again, the vocational expert failed to testify about how these apparent inconsistencies with the requirements of the DOT could be resolved. The vocational expert's testimony was inconsistent with the DOT given the physical limitations found by the ALJ.

Further, the vocational expert's testimony is also facially inconsistent with the DOT in that the job of cashier requires "Level 3" reasoning and dealing with people. *Id*. The DOT defines reasoning at level 3 as an ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id*. at 211.462-010.

There is substantial evidence in the record to indicate that Ms. Young is not able to perform level 3 reasoning. In a July, 2008, function report, Ms. Young stated that she had difficulty with personal care; needed reminders to bathe and take her medicine; needed encouragement to perform household tasks; and had difficulty concentrating enough to maintain a checkbook or bank account. (SSA record at 250-53, 292-98)

Further, the job of cashier requires working with and around people. The record indicates that Ms. Young did not socialize with others or go anywhere except for an occasional trip to Wal-mart accompanied by her mother or son; she had problems getting along with others because she was "quick to argue or want to fight;" and she could not handle stress or changes in routine. (*Id*. at 250-53, 292-98)

Ms. Young's treating physicians noted that she had poor judgment. In August, 2009, Rebecca Osborne, M.D., noted an incident where Ms. Young got very angry and upset, told her she had "the personality of a dead horse" and called her a "bitch." (*Id*. at 1363) The incident led to Dr. Osborne's terminating Ms. Young as a patient. (*Id*.)

Genevieve Hancock, Ms. Young's mother, completed a third party function report for her daughter. Ms. Hancock corroborated that Ms. Young had difficulty getting along with people; had to be reminded to bathe or comb her hair, take her medicine, and clean her house; had to be taken to her medical appointments; had trouble completing projects; had difficulty loading the dishwasher due to pain in her knees, back, and shoulders; and had uncontrolled diabetes. (*Id*. at 312-323)

Ms. Young's treatment records at Families, Inc. also corroborate her difficulty with depression and anxiety that make it difficult for her to leave the house. Her treatment providers at Families, Inc. noted that Ms. Young had problems with medication compliance; grooming and hygiene; and difficulty getting along with people. (*Id*. at 1218-1232, 1565, 1567, 1569, 1582)

Ms. Young reported to Samuel B. Hester, a consulting examiner, that she started tasks but never completed them; she had short frustration tolerance and irritability with verbal outbursts; and that the frequency and intensity of the anger outbursts were better on medication but still occurred.  (*Id*. at 1464)  She also reported that on her last job, she had problems with verbal outbursts.  (*Id*. at 1466)

Dr. Hester diagnosed mood disorder, NOS, and pain disorder associated with both medical and psychological factors, and cocaine dependence, in full sustained remission. He found that Ms. Young was likely to be able to cope with the typical mental demands of basic work-like tasks; attend and sustain concentration on basic tasks; had the capacity to sustain persistence in completing tasks; and had the capacity to complete work-like tasks within an acceptable time-frame "*as long as the tasks do not aggravate her pain issues*."  (*Id*.)(emphasis added)

The ALJ relied on Dr. Hester's statement to support his conclusion that Ms. Young was able to cope with the typical mental demands of basic work-like tasks, but he appears to have ignored the condition Dr. Hester attached to the statement, and there is not substantial evidence in the record to support the assertion that work as a cashier or table inspector would not aggravate her pain issues.  Ms. Young is obese (*Id*. at 1238), has uncontrolled diabetes mellitus (*Id*. at 1241, 1298, 1347, 1353, 1404, 1405, 1407, 1445, 1450-52, 1559), hypertension (*Id*. at 1238, 1404, 1559), back pain (*Id*. at 1026-29,

1052, 1061, 1290-91, 1379), carpal tunnel[5] (*Id*. at 1044, 1096, 1111-17, 1399-1400) and shoulder pain (*Id*. at 871, 877-78, 1367-68).  The cashier and table inspector jobs, which as set forth in the DOT require frequent reaching, handling, and fingering, are likely to aggravate Ms. Young's pain issues rendering her incapable of coping with the job.

The ALJ discounted Ms. Young's claims of limitation due to her mental impairments.  While he acknowledged that Ms. Young had been diagnosed with bipolar disorder, he stated that her condition was stable as long as she was taking her medications.  (*Id*. at 20, 23)  The medical records, however, do not bear this out.  The records indicate that Ms. Young's mental condition continued to be unstable in spite of medication and therapy.

State agency physician, Jerry R. Henderson, M.D. noted in his review of Ms. Young's records in December, 2008, that Ms. Young's allegation of increased severity of symptoms was "to some degree supported by treatment records." (*Id*. at 1152)

Ms. Young's Global Assessment of Functioning (GAF) score was 27 following a suicide attempt in May, 2008.  (*Id*. at 564)  After the suicide attempt, Ms. Young spent four days in the psychiatric unit at St. Bernard's Regional Medical Center.  (*Id*. at 561-64)  On discharge, her GAF score had risen to 57.  (*Id*. at 584)

---

[5]Ms. Young underwent carpal tunnel release surgery on her right hand.  However, even after the surgery she continued to complain of pain in her right wrist and was prescribed a brace.  (*Id*.  1111-12, 1396-1402)

Since May, 2008, Ms. Young sought treatment at Mid-South Health Systems and Families, Inc. In spite of being on various medications and therapy, her GAF scores have remained mostly in the 41 to 50 range, indicating serious symptoms or serious impairment in social or occupational functioning. (*Id*. at 1191, 1193, 1200, 1206, 1213, 1372, 1495, 1500-03, 1572, 1576, 1580) American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev. 2000); see also *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)(noting ALJ's failure to consider claimant's logitudinal record of GAF scores of 50 or less as support for work limitations was error). In February, 2009, Ms. Young was treated at the hospital for an anxiety attack. (*Id*. at 1515-16) In May, 2010, Ms. Young's physician at Families, Inc. completed a certification of serious mental illness form indicating that Ms. Young met the criteria of an adult with a serious mental illness. (*Id*. at 1576) In October, 2010, a new diagnosis of obsessive-compulsive disorder was added by Joann Clay, APN. (*Id*. at 1503) In a letter dated April 10, 2012, Elmo Diaz, M.D., wrote that Ms. Young's diagnosis is bipolar disorder and her prognosis is "guarded." (*Id*. at 1597)

Kay Cogbill, M.D., who reviewed Ms. Young's records on behalf of the Commissioner in September, 2010, found that Ms. Young was moderately limited in the following categories: ability to carry out detailed instructions, maintain attention and concentration for extended periods; ability to sustain an ordinary routine without special supervision without being distracted by them; ability to complete a normal work-day and

work-week without interruptions from psychologically based symptoms and to perform a consistent pace without an unreasonable number and length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to respond appropriately to changes in the work setting; and ability to set realistic goals or make plans independently of others. (*Id*. at 1491)

Ms. Young's mental impairments, combined with her physical impairments and resulting limitations, rendered it necessary for the ALJ to illicit testimony from the vocational expert explaining the inconsistencies between his testimony and the DOT.

In assessing Ms. Young's credibility, the ALJ correctly noted that the record reflected some noncompliance with medication and treatment, but this court has recognized that a mentally ill claimant's noncompliance with treatment can be, and ordinarily is, the result of her mental impairment, and thus is not necessarily willful or without a justifiable excuse. See *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (noting that a mentally ill person's non-compliance with medications can be, and usually is, the result of the mental impairment and not willful non-compliance). Additionally, here there are numerous instances in the record where Ms. Young stated that she was unable to afford medication and treatment as well as instances where she sought low-cost or free treatment. (*Id*. at 1383, 1388, 1390, 1392, 1395, 1407-08, 1560, 1570, 1572) Moreover, the ALJ's reliance on Ms. Young's former drug abuse is not be a valid reason

for finding her not credible, given that she had been clean for several years.  See *Conklin v. Astrue*, 360 F. App'x 704, 705-06 (8th Cir. 2010).

**Conclusion and Remand**

For all the reasons set forth above, the ALJ erred by relying on vocational expert testimony that was inconsistent with the DOT at step 5 of the sequential evaluation process.  For this reason, the court reverses the Commissioner's decision and remands this case for a reconsideration of Ms. Young's application based on all of the available evidence.

It is so ordered this 20th day of February, 2014.

_____
UNITED STATES MAGISTRATE JUDGE